**JUSTIN M. BAXTER,** OSB #992178
justin@baxterlaw.com
8835 S.W. Canyon Lane, Suite 130
Portland, Oregon 97225
Telephone (503) 297-9031
Facsimile (503) 291-9172

**KEITH D. KARNES,** OSB #033521
kkarnes@olsendaines.com
Olsen, Olsen & Daines
3995 Hagers Grove Road SE
Salem, OR 97309-0829
Telephone (503) 362-9393
Facsimile (503) 362-1375

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| NIKALAS BRADSHAW, MEGAN BRADSHAW | Case No. 3:10-CV-00438-HA |
| Plaintiffs, | AMENDED PRETRIAL ORDER |
| v. | |
| BAC HOME LOANS SERVICING, LP, a foreign corporation; TRANS UNION, LLC, a foreign company; EXPERIAN INFORMATION SOLUTIONS, INC., a foreign corporation, EQUIFAX INFORMATION SERVICES LLC, a foreign company. | |
| Defendants. | |

Page  1 – AMENDED PRETRIAL ORDER

The following Pre-Trial Order is lodged pursuant to L.R. 16.6 and the Order of the Court.

**I.    NATURE OF THE ACTION**        Plaintiffs Nickalas Bradshaw and Megan Bradshaw bring this action against Trans Union, LLC ("Trans Union") pursuant to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq*.  Trial will be to a jury.

**II.    SUBJECT MATTER JURISDICTION**

This court has jurisdiction over the claims pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

**III.    AGREED FACTS**

1.    Trans Union is a "consumer reporting agency" as defined by the FCRA.  Trans Union provides consumer credit reports to subscribers who use the information to make credit related decisions.  Trans Union collects account information from its subscribers and includes this information in credit reports.

2.    Experian Information Solutions, Inc. ("Experian") and Equifax Information Services, LLC ("Equifax") are also "consumer reporting agenc[ies]" as defined by the FCRA.*

3.    Plaintiffs are "consumers" as defined by the FCRA.

4.    Plaintiffs had a fixed-interest rate mortgage through Countrywide Financial Corporation ("Countrywide").

5.    In July 2008, Bank of America purchased Countrywide and eventually began servicing existing Countrywide mortgages (including Plaintiffs' mortgage) through BAC Home Loans Servicing, LP ("BAC").  BAC reported data regarding Plaintiffs' mortgage to Trans Union under BAC account xxxx5369 (the "Account").

6.    During 2008 and up until January 2009, Plaintiffs made their regular monthly mortgage payment of $1,435, and in February and March of 2009, they overpaid slightly, making

mortgage payments of $1,450. Countrywide did not assess any late fees for any of those payments.

7.      In 2008, Plaintiffs applied for a modification to their interest rate in order to lower their payments. In March 2009, they received a letter from Countrywide (the "Offer Letter") which stated: "We are pleased to advise you that your loan modification has been approved. In order for the modification to be valid, the enclosed documents need to be signed and returned."

8.      The Offer Letter also stated: "If any issues arise between the date of this commitment and the date on which all of the terms and conditions of this letter are finalized, including, but not limited to . . . liens, additional expenses and defaulted amount, then we [Countrywide] may terminate this offer and pursue all collection action, including foreclosure."

9.      Importantly, the Offer Letter also expressly stated: "This Letter does not stop, waive or postpone . . . credit reporting actions we have taken or contemplate taking against you and the property."

10.      Plaintiffs signed, dated and returned a complete set of the enclosed documents to Countrywide via Fed Ex on March 21, 2009.

11.      Plaintiffs did not submit any mortgage payments to their mortgage servicer during the month of April 2009.

12.      When Plaintiffs they received their next monthly mortgage statement, it did not reflect the lowered monthly payment amount as stated in the Offer Letter.

13.      Upon inquiry, Mr. Bradshaw was informed that the acceptance of the modification was still pending.

14.      Plaintiffs paid $1,371.30 (the amount stated in the Offer Letter) for the months of May, June and July.

15.    Mr. Bradhsaw was aware that when submitting the payments in May, June and July, he incurred late fees and that the Account reflected an increasing past due balance.

16.    [Deleted].

17.    On November 13, 2009, Mr. Bradshaw contacted BAC's collections department and was told that the Account was delinquent.

18.    On November 18, 2009, Mr. Bradshaw initiated an online dispute of the Account, claiming that it was "never late," but provided no other information or documents.

19.    On November 20, 2009, Mrs. Bradshaw also initiated an online dispute of the Account, claiming that it was "never late," but provided no other information or documents.

20.    Trans Union's policy is always to investigate a consumer's non-frivolous dispute of reported information and to correct all inaccuracies brought to its attention.  When a consumer submits a dispute to Trans Union, the disputed item and the relevant information contained in the dispute are recorded on a Consumer Dispute Verification ("CDV") form, which is then sent to the furnisher.  After receiving furnishers' responses to CDVs, Trans Union makes changes or deletions, as appropriate, based on the CDV responses.  Trans Union then sends an updated disclosure to the consumer advising of the results of the investigation within thirty days of receipt of the dispute.*

21.    In response to Plaintiffs' online disputes, Trans Union sent CDV forms to BAC asking that BAC verify the information it had provided to Trans Union regarding the Account for each Plaintiff.

22.    Before Trans Union will agree to accept information from a subscriber such as BAC, Trans Union conducts an investigation of the proposed subscriber to assure the reliability and viability of the subscriber.  If Trans Union is satisfied, after this investigation, the subscriber

is required to enter into written agreements with Trans Union obligating it to supply accurate information and to cooperate with investigations. Subscribers are also subject to periodic audits to ensure that they continue to comply with their obligations to supply accurate information.

23.    Whenever a subscriber responds to a manual or electronic dispute investigation, Trans Union requires it to expressly certify that the information in its response is correct, that it has verified the accuracy of the entire item in compliance with all legal requirements and its records will be adjusted to reflect any changes noted.

24.    BAC told Trans Union that the information in the CDVs matched the information it had reported to Trans Union regarding the Account for each Plaintiff.

25.    On November 21, 2009, Trans Union forwarded to Mr. Bradshaw the results of its investigation online.

26.    On November 25, 2009, Trans Union forwarded to Mrs. Bradshaw the results of its investigation online.

27.    Consistent with the requirements of the FCRA, Trans Union also advised Plaintiffs of their right to add a consumer statement to their files if the reinvestigation did not resolve their disputes and to have revised reports sent to those who had received reports prior to changes or the addition of the consumer statement.

28.    On December 7, 2009, Trans Union received separate written correspondence from Plaintiffs dated November 30, 2009, disputing the accuracy of the Account, including the delinquency status and past due amount reported. Plaintiffs enclosed copies of the Offer Letter from Countrywide, a loan modification agreement unsigned by Countrywide (the "Unsigned Loan Modification Agreement") and a transaction history obtained by Plaintiffs from BAC regarding payments made on the Account from June 2008 through November 2009.

29.    Plaintiffs sent letters and supporting documents to Experian and Equifax, disputing the status of the Account information reported by Experian and Equifax, which information was the same as that reported by Trans Union.*

30.    Consistent with Trans Union's policies and procedures, Trans Union was "unable to authenticate" Plaintiffs' documents provided with their dispute letters as the Offer Letter and Unsigned Loan Modification Agreement were not authored by BAC and the transaction history was only a printed copy of an electronic statement.

31.    "Unable to authenticate" is credit reporting industry standard verbiage meaning that Trans Union is unable to authenticate information in, utilize, or accept without additional information documentation a consumer sends with a dispute.

32.    Again, Trans Union initiated an investigation into the status of the Account for both Plaintiffs by submitting CDVs to BAC.  With respect to the Account, the CDVs informed BAC that Plaintiffs claimed BAC would change the account information and requested that BAC verify all account information.

33.    The CDVs also informed BAC that Trans Union was unable to authenticate documentation submitted by the Plaintiffs with their dispute.

34.    Experian and Equifax also initiated investigations into Plaintiffs' disputed Account using the CDV process, but also did not forward Plaintiffs' submitted documentation.*

35.    Again, BAC responded to the CDVs, including those sent by Experian and Equifax, by updating the date on which the Account was verified to December 2009 and BAC told the CRAs that the information in the CDVs matched the information it had reported to the CRAs regarding the Account for each Plaintiff.  *

36.    Trans Union mailed Plaintiffs the results of their individual disputes on December 10 and 11, 2009, respectively. The results regarding BAC Home Loans stated, "Verified, No Change." Trans Union reported the account "Past Due: $10,608" and a pay status of 120 days past due. 37.   Consistent with the requirements of the FCRA, Trans Union also again advised Plaintiffs of their right to add a consumer statement to their files if the reinvestigation did not resolve their dispute and to have revised reports sent to those who had received reports prior to changes or the addition of the consumer statement.

38.    Experian and Equifax also forwarded Plaintiffs the results of their disputes, and reported the Account information consistent with that information reported by Trans Union.*

39.    Two months later, on February 22, 2010, Trans Union received a third dispute from each Plaintiff dated February 16, 2011, disputing the accuracy of the Account, including the delinquency status and past due amount reported.

40.    Plaintiffs again included the Offer Letter, Unsigned Loan Modification Agreement and an updated transaction history through February 2010.

41.    Experian and Equifax also received identical dispute letters and supporting documentation from Plaintiffs.*

43.    Again, Trans Union was "unable to authenticate" Plaintiffs' documents provided with their dispute letters as the Offer Letter and Unsigned Loan Modification Agreement were not authored by BAC and the transaction history was only a printed copy of an electronic statement.

44.    In response to Plaintiffs' dispute, Trans Union initiated a third investigation into the status of the Account for both Plaintiffs by submitting CDVs to BAC. With respect to the Account, the CDVs informed BAC that Plaintiffs claimed that the account status and payment

history profile was inaccurate, that BAC would change the account information and requested that BAC verify all account information.

45.     The CDVs also informed BAC that Trans Union was unable to authenticate documentation submitted by the Plaintiffs with their dispute.

46.     Equifax also initiated investigations into Plaintiffs' disputed Accounts, again relying on the CDV process.*

47.     The Experian agent who processed Mrs. Bradshaw's dispute initiated an investigation into the Account. However, the Experian agent who processed Mr. Bradshaw's dispute determined that no additional investigation was necessary as the Account had been verified in December 2009. *

48.     Again, BAC responded to all CDVs by updating the date on which the Account was verified to February 2010. BAC told Trans Union that the information in the CDVs matched the information it had reported to Trans Union regarding the Account for each Plaintiff.

49.     On March 1, 2010, Trans Union mailed Plaintiffs the results of their individual disputes. The results regarding BAC Home Loans stated, "Verified, No Change." Trans Union reported the account "Past Due: $7,577" and a pay status of 120 days past due.

50.     Consistent with the requirements of the FCRA, Trans Union again advised Plaintiffs of their right to add a consumer statement to their files if the reinvestigation did not resolve their dispute and to have revised reports sent to those who had received reports prior to changes or the addition of the consumer statement. Despite Trans Union's third advisement of the availability of those procedures, Plaintiffs again refused to avail themselves of their rights and instead, commenced litigation against Trans Union.*

51.     Equifax also mailed Plaintiffs the results of their individual disputes.*

52.     Experian mailed Mrs. Bradshaw thee results of her dispute and mailed Mr. Bradhsaw a letter informing him that if he had additional relevant information in support of his dispute to submit that to Experian to be used in a later investigation.*

53.     Mr. Bradshaw applied for, and was denied, a Visa card through Simmons.  The reasons listed for that denial included excessive obligations in relation to income, delinquent past or present credit obligations with others and amounts owed on revolving account were too high as reported on his credit report obtained from Trans Union.

54.     Mr. Bradshaw applied for, and was denied, a Discover Card.  The reasons listed for that denial included serious delinquencies, time since delinquencies were too recent or unknown and too many accounts with balances reporting on his credit report obtained from Trans Union.

IV.     **TRANS UNION'S STATEMENT OF FACTS**

Trans Union requests that the following narrative be included in this pretrial order.  In the interest of clarity and readability, Plaintiffs recite Trans Union's statement of facts in full here, even though Trans Union's narrative includes some undisputed facts from the preceding section.

1.     Trans Union is a "consumer reporting agency" as defined by the FCRA.  Trans Union provides consumer credit reports to subscribers who use the information to make credit related decisions.  Trans Union collects account information from its subscribers and includes this information in credit reports.

2.     Experian Information Solutions, Inc. ("Experian") and Equifax Information Services, LLC ("Equifax") are also "consumer reporting agenc[ies]" as defined by the FCRA.

3.     Plaintiffs are "consumers" as defined by the FCRA.

4.     Plaintiffs had a fixed-interest rate mortgage through Countrywide Financial

Corporation ("Countrywide").

    5.    In July 2008, Bank of America purchased Countrywide and eventually began servicing existing Countrywide mortgages (including Plaintiffs' mortgage) through BAC Home Loans Servicing, LP ("BAC"). BAC reported data regarding Plaintiffs' mortgage to Trans Union under BAC account xxxx5369 (the "Account").

    6.    During 2008 and up until January 2009, Plaintiffs made their regular monthly mortgage payment of $1,435, and in February and March of 2009, they overpaid slightly, making mortgage payments of $1,450. Countrywide did not assess any late fees for any of those payments.

    7.    In 2008, Plaintiffs applied for a modification to their interest rate in order to lower their payments. In March 2009, they received a letter from Countrywide (the "Offer Letter") which stated: "We are pleased to advise you that your loan modification has been approved. In order for the modification to be valid, the enclosed documents need to be signed and returned."

    8.    The Offer Letter also stated: "If any issues arise between the date of this commitment and the date on which all of the terms and conditions of this letter are finalized, including, but not limited to . . . liens, additional expenses and defaulted amount, then we [Countrywide] may terminate this offer and pursue all collection action, including foreclosure."

    9.    Importantly, the Offer Letter also expressly stated: "This Letter does not stop, waive or postpone . . . credit reporting actions we have taken or contemplate taking against you and the property."

    10.    Plaintiffs signed, dated and returned a complete set of the enclosed documents to Countrywide via Fed Ex on March 21, 2009.

    11.    Plaintiffs admit that they did not submit any mortgage payments to their mortgage

servicer during the month of April 2009.

12.    Plaintiffs admit that when they received their next monthly mortgage statement, it did not reflect the lowered monthly payment amount as stated in the Offer Letter.

13.    Plaintiffs admit that, upon inquiry, Nickalas was informed that the acceptance of the modification was still pending.

14.    Plaintiffs admit that they only paid $1,371.30 (the amount stated in the Offer Letter) for the months of May, June and July.

15.    Plaintiffs admit that Nickalas was aware that when submitting the payments in May, June and July, he incurred late fees and that the Account reflected an increasing past due balance.

16.    Plaintiffs admit they have no evidence to show they made a mortgage payment in August 2009.

17.    Plaintiffs admit that on November 13, 2009, Nickalas contacted BAC's collections department and was informed that the terms and conditions of the Offer Letter never were finalized and that the Account was delinquent.

18.    On November 18, 2009, Nickalas initiated an online dispute of the Account, claiming that it was "never late," but provided no other information or documents.

19.    On November 20, 2009, Megan also initiated an online dispute of the Account, claiming that it was "never late," but provided no other information or documents.

20.    Trans Union's policy is always to investigate a consumer's non-frivolous dispute of reported information and to correct all inaccuracies brought to its attention.  When a consumer submits a dispute to Trans Union, Trans Union analyzes the dispute to determine if it can be resolved based on solely on the information the consumer submitted.  If it cannot, Trans Union

verifies the information with the furnisher that supplied it. To do so, the disputed item and the relevant information contained in the dispute are recorded on a Consumer Dispute Verification ("CDV") form, which is then sent to the furnisher. After receiving furnishers' responses to CDVs, Trans Union reviews the consumer's file and makes changes or deletions, as appropriate, based on the CDV responses. Trans Union then sends an updated disclosure to the consumer advising of the results of the investigation within thirty days of receipt of the dispute.

21.    In response to Plaintiffs' online disputes, Trans Union sent CDV forms to BAC asking that BAC verify the information it had provided to Trans Union regarding the Account for each Plaintiff.

22.    Before Trans Union will agree to accept information from a subscriber such as BAC, Trans Union conducts an investigation of the proposed subscriber to assure the reliability and viability of the subscriber. If Trans Union is satisfied, after this investigation, the subscriber is required to enter into written agreements with Trans Union obligating it to supply accurate information and to cooperate with investigations. Subscribers are also subject to periodic audits to ensure that they continue to comply with their obligations to supply accurate information.

23.    Whenever a subscriber responds to a manual or electronic dispute investigation, Trans Union requires it to expressly certify that the information in its response is correct, that it has verified the accuracy of the entire item in compliance with all legal requirements and its records will be adjusted to reflect any changes noted.

24.    BAC verified the accuracy of the information that it reported to Trans Union regarding the Account for each Plaintiff.

25.    On November 21, 2009, Trans Union forwarded to Nickalas the results of its investigation online, evidencing BAC's verification of the Account's accuracy.

26.    On November 25, 2009, Trans Union forwarded to Megan the results of its investigation online, again evidencing BAC's verification of the Account's accuracy.

27.    Consistent with the requirements of the FCRA, Trans Union also advised Plaintiffs of their right to add a consumer statement to their files if the reinvestigation did not resolve their disputes and to have revised reports sent to those who had received reports prior to changes or the addition of the consumer statement.

28.    On December 7, 2009, Trans Union received separate, but identical written correspondence from Plaintiffs dated November 30, 2009, disputing the accuracy of the Account, including the delinquency status and past due amount reported.  Plaintiffs enclosed copies of the Offer Letter from Countrywide, a loan modification agreement unsigned by Countrywide (the "Unsigned Loan Modification Agreement") and a transaction history obtained by Plaintiffs from BAC regarding payments made on the Account from June 2008 through November 2009.

29.    Plaintiffs sent identical letters and supporting documents to Experian and Equifax, disputing the status of the Account information reported by Experian and Equifax, which information was the same as that reported by Trans Union.

30.    Consistent with Trans Union's policies and procedures, Trans Union was "unable to authenticate" Plaintiffs' documents provided with their dispute letters as the Offer Letter and Unsigned Loan Modification Agreement were not authored by BAC and the transaction history was only a printed copy of an electronic statement.

31.    "Unable to authenticate" is credit reporting industry standard verbiage meaning that Trans Union is unable to authenticate information in, utilize, or accept without additional information documentation a consumer sends with a dispute.

32.     Again, Trans Union initiated an investigation into the status of the Account for both Plaintiffs by submitting CDVs to BAC. With respect to the Account, the CDVs informed BAC that Plaintiffs claimed BAC would change the account information and requested that BAC verify all account information.

33.     The CDVs also informed BAC that Trans Union was unable to authenticate documentation submitted by the Plaintiffs with their dispute.

34.     Experian and Equifax also initiated investigations into Plaintiffs' disputed Account using the CDV process, but also did not forward Plaintiffs' submitted documentation.

35.     Again, BAC responded to the CDVs, including those sent by Experian and Equifax, by updating the date on which the Account was verified to December 2009 and verifying that all the disputed information regarding the Account was accurate as of the date it was reported.

36.     Trans Union mailed Plaintiffs the results of their individual disputes on December 10 and 11, 2009, respectively, again evidencing BAC's verification of the Account's accuracy. The results regarding BAC Home Loans stated, "Verified, No Change." Trans Union reported the account "Past Due: $10,608" and a pay status of 120 days past due. 37. Consistent with the requirements of the FCRA, Trans Union also again advised Plaintiffs of their right to add a consumer statement to their files if the reinvestigation did not resolve their dispute and to have revised reports sent to those who had received reports prior to changes or the addition of the consumer statement.

38.     Experian and Equifax also forwarded Plaintiffs the results of their disputes, evidencing BAC's verification of the Account's accuracy and reported the Account information consistent with that information reported by Trans Union.

39.    Two months later, on February 22, 2010, Trans Union received a third dispute from each Plaintiff dated February 16, 2011, disputing the accuracy of the Account, including the delinquency status and past due amount reported. Plaintiffs' dispute letters were virtually identical to those Trans Union received on December 7, 2009, noting only that Plaintiffs were writing "once again" to dispute the reporting of the Account.

40.    Plaintiffs again included the Offer Letter, Unsigned Loan Modification Agreement and an updated transaction history through February 2010.

41.    Experian and Equifax also received identical dispute letters and supporting documentation from Plaintiffs.

43.    Again, Trans Union was unable to authenticate Plaintiffs' documents provided with their dispute letters as the Offer Letter and Unsigned Loan Modification Agreement were not authored by BAC and the transaction history was only a printed copy of an electronic statement.

44.    In response to Plaintiffs' dispute, Trans Union initiated a third investigation into the status of the Account for both Plaintiffs by submitting CDVs to BAC. With respect to the Account, the CDVs informed BAC that Plaintiffs claimed that the account status and payment history profile was inaccurate, that BAC would change the account information and requested that BAC verify all account information.

45.    The CDVs also informed BAC that Trans Union was unable to authenticate documentation submitted by the Plaintiffs with their dispute.

46.    Equifax also initiated investigations into Plaintiffs' disputed Accounts, again relying on the CDV process.

47.    The Experian agent who processed Megan's dispute initiated an investigation into

the Account. However, the Experian agent who processed Nickalas' dispute determined that no additional investigation was necessary as the Account had been verified in December 2009.

48.    Again, BAC responded to all CDVs by updating the date on which the Account was verified to February 2010 and verifying that all disputed information regarding the Account was accurate as of the date it was reported.

49.    On March 1, 2010, Trans Union mailed Plaintiffs the results of their individual disputes, evidencing BAC's third verification of the Account's accuracy. The results regarding BAC Home Loans stated, "Verified, No Change." Trans Union reported the account "Past Due: $7,577" and a pay status of 120 days past due.

50.    Consistent with the requirements of the FCRA, Trans Union again advised Plaintiffs of their right to add a consumer statement to their files if the reinvestigation did not resolve their dispute and to have revised reports sent to those who had received reports prior to changes or the addition of the consumer statement. Despite Trans Union's third advisement of the availability of those procedures, Plaintiffs again refused to avail themselves of their rights and instead, commenced litigation against Trans Union.

51.    Equifax also mailed Plaintiffs the results of their individual disputes, evidencing BAC's repeated verification of the Account's accuracy.

52.    Experian mailed Megan thee results of her dispute, evidencing BAC's repeated verification of the Account's accuracy and mailed Nickalas a letter informing him that if he had additional relevant information in support of his dispute to submit that to Experian to be used in a later investigation.

53.    Nickalas applied for, and was denied, a Visa card through Simmons. The reasons listed for that denial included excessive obligations in relation to income, delinquent past or

present credit obligations with others and amounts owed on revolving account were too high as reported on his credit report obtained from Trans Union.

54.    Nickalas applied for, and was denied, a Discover Card. The reasons listed for that denial included serious delinquencies, time since delinquencies were too recent or unknown and too many accounts with balances reporting on his credit report obtained from Trans Union.

## V.    CLAIMS AND DEFENSES

Claim One:

(A)    Plaintiffs contend that Trans Union negligently failed to comply with the requirements of the FCRA, 15 U.S.C. § 1681o. Plaintiffs seek actual damages and the costs of the action together with reasonable attorney's fees and expenses.

(B)    Trans Union contends:

    (1)    Trans Union denies Plaintiffs' contentions.

    (2)    Trans Union's reporting of Plaintiffs' Account was accurate.

    (3)    Trans Union's reporting did not contain any factual deficiency that could have been resolved by a reasonable reinvestigation.

    (4)    Trans Union followed reasonable procedures to assure maximum possible accuracy of the information in Plaintiffs' consumer disclosures.

    (5)    Trans Union reasonably relied upon information provided to it by BAC regarding Plaintiffs' Account.

    (6)    BAC verified the accuracy of the information it provided to Trans Union on six separate occasions.

    (7)    Trans Union conducted reasonable re-investigations of Plaintiffs' disputes.

    (8)    Plaintiffs' alleged damages are the result of acts or omissions on the part

of BAC.

(9)     Plaintiffs did not experience emotional distress as a proximate result of any act or omission on the part of Trans Union.

(10)    Plaintiffs unreasonably failed to mitigate their damages.

Claim Two:

(A)    Plaintiffs contend that Trans Union willfully failed to comply with the requirements of the FCRA, 15 U.S.C. § 1681n.  Plaintiffs seek actual damages, punitive damages and the costs of the action together with reasonable attorney's fees and expenses.

(B)    Trans Union contends:

(1)     Trans Union denies Plaintiffs' contentions.

(2)     Trans Union's reporting of Plaintiffs' Account was accurate.

(3)     Trans Union's reporting did not contain any factual deficiency that could have been resolved by a reasonable reinvestigation.

(4)     Trans Union followed reasonable procedures to assure maximum possible accuracy of the information in Plaintiffs' consumer disclosures.

(5)     Trans Union reasonably relied upon information provided to it by BAC regarding Plaintiffs' Account.

(6)     BAC verified the accuracy of the information it provided to Trans Union on six separate occasions.

(7)     Trans Union conducted reasonable re-investigations of Plaintiffs' disputes.

(8)     Trans Union did not intentionally fail to re-investigate Plaintiffs' Account.

(9)     Trans Union did not recklessly fail to re-investigate Plaintiffs' Account.

(10)    Plaintiffs' alleged damages are the result of acts or omissions on the part

of BAC.

(11)    Plaintiffs did not experience emotional distress as a proximate result of any act or omission on the part of Trans Union.

(12)    Plaintiffs unreasonably failed to mitigate their damages.

## VI.    OTHER LEGAL ISSUES

Trans Union intends to file:

(A)    Motions *In Limine* to exclude:

(1)    Evidence of prior complaints/cases involving Trans Union's allegedly unreasonable procedures to assure maximum possible accuracy of a consumer's report information;

(2)    Evidence of prior complaints/cases involving Trans Union's allegedly inadequate reinvestigation procedures;

(3)    Evidence of Trans Union's financial condition, net worth and profits;

(4)    Evidence of prior complaints/cases involving other credit reporting agencies' allegedly unreasonable procedures to assure maximum possible accuracy of consumer's report information or involving other credit reporting agencies' allegedly inadequate reinvestigation procedures;

(5)    Hearsay statements made by Plaintiffs;

(6)    Other evidence for reasons not reasonably known to Trans Union until after the deposition of Plaintiffs' expert witness and/or after Plaintiffs file their Exhibit Lists, Lay Witness Statements and Itemized List of Special Damages.

(B)    Motion To Bifurcate Calculation Of Punitive Damages Until After Jury Has

Determined Liability For Willfulness.

    (C)     Motion To Exclude Plaintiffs' Expert Witness Testimony Under Federal Rules Of Civil Procedures 37(c)(1) and 26(a)(2)(B) and Under Federal Rule Of Evidence 702 And <u>Daubert</u>.

## VII.    AMENDMENTS TO PLEADINGS

    None.

Dated this _____ day of _____, 2011.


/s/ Justin M. Baxter
_____
Justin M. Baxter, OSB 992178
Attorney for Plaintiffs


/s/ Karen Reisinger
_____
Karen Reisinger, admitted pro hac vice
Attorney for Defendant Trans Union, LLC

---

### For Court Use Only

**The foregoing Pretrial Order is:**

    ✓ Approved as lodged.

    ___ Approved as amended by interlineation and the pleadings are amended accordingly.


**SO ORDERED this __1__ day of _November_, 2011.**

_____
**Hon. Ancer Haggerty**
**United States District Court Judge**


Page 20 – AMENDED PRETRIAL ORDER